IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| AMERISURE MUTUAL INSURANCE COMPANY, | § § | |
|     *Plaintiff*, | § | CIVIL ACTION NO. 5:20-cv-01332 |
| v. | § | |
| | § | |
| MCMILLIN TEXAS HOMES, LLC, | § | |
|     *Defendants*. | § | |

## ORIGINAL COMPLAINT AND
## REQUEST FOR DECLARATORY JUDGMENT

Plaintiff Amerisure Mutual Insurance Company ("Amerisure") comes before this Court pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §2201, *et seq.*, seeking declaratory relief regarding the rights, status and legal relationship between Amerisure and Defendant.

## I.     PARTIES

1.1     Plaintiff Amerisure is an insurance company incorporated in Michigan with its principal place of business in Farmington Hills, Michigan.  Great American is authorized to do business in Texas and is conducting business in San Antonio, Texas.

1.2     Defendant McMillin Texas Homes, LLC ("McMillin") is a limited liability corporation organized under the laws of the State of Texas with its principal place of business in Texas.  Its members, as disclosed in public records, are identified as follows:

- Edward Berlanga: citizen of Texas

McMillin may be served with process by delivering a copy of this lawsuit to its registered agent, Gary W. Javore at 5802 IH-10 West, San Antonio, Texas 78201.

## II.     JURISDICTION AND VENUE

2.1     A justiciable controversy exists between Amerisure and Defendant as to the rights and

obligations of the parties in connection with the insurance claim(s) tendered to Amerisure by McMillin arising out of the construction of multiple homes in San Antonio, Texas (hereinafter, "Insurance Claims").  The requirement in federal court that an actual controversy exist before a declaratory judgment can be issued is satisfied in an action such as this even though the case has not proceeded to an award.  *See Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 368 (5th Cir. 1998) ("[a]n actual controversy may exist when an insurance carrier seeks a declaratory judgment that it has a duty neither to defend nor indemnify its insured in a state court action that has not yet proceeded to judgment").  As the Fifth Circuit explained in *Bailey*, "[g]iven that the district court was going to decide the issue of the duty to defend …, it was not an abuse of discretion for the district court also to decide the issue of the duty to indemnify."  *Id*. at 368–69.

2.2      Personal jurisdiction is proper in this Court under 28 U.S. Code § 1332 because Plaintiff is a citizen of a different state than Defendant.

2.3      Subject matter jurisdiction is proper in this Court because this declaratory judgment action is brought pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201, *et seq.*, and the amount in controversy exceeds the minimum jurisdictional limits of this Court.  The per occurrence limit under each of the Insurance Policies at issue is $1,000,000.  This coverage suit centers on the question of coverage for 17 underlying claims alleging damage to homes built by Defendant, and thus it is readily apparent the amount in controversy exceeds $75,000, exclusive of interest and costs, therefore, this Court has exclusive jurisdiction over this case.

2.4      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).  Specifically, a substantial part of the events or omissions giving rise to the Insurance Claims occurred in this district and the property(ies) at issue in the Insurance Claims are located in this district.

### III.    FACTS

3.1    McMillin is a developer, general contractor and seller of homes.  Utilizing subcontractors, McMillin built multiple homes in various residential communities in the San Antonio area.   After the homes were completed, issues arose regarding deficiencies in the construction of the homes relating to the "artificial stucco" exterior finish.

3.2    Several homeowners made claims pursuant to Chapter 27 of the Texas Property Code (Residential Construction Liability Act or RCLA) concerning the damages "on the exterior stucco finish of the residence[s]" and claiming "the stucco observed at the residence[s] was not installed in accordance with the code in effect at the time of the original construction." ("RCLA Demands").[1]  The RCLA Demand Letters from the homeowners contain identical allegations.  *See* **Exhibit** A, RCLA Demands.  Said homeowners are listed in the chart in the section titled "The Policies" herein.

3.3    One of the homeowners who made a RCLA Demand, Timothy Victor, also filed a Demand for Arbitration on February 24, 2020 styled Case No. 01-20-0000-6241; *Timothy Victor v. McMillin Texas Homes, LLC*; American Arbitration Association (the "Arbitration").  *See* **Exhibit B,** Arbitration.  Close of escrow on the Victor home was on October 8, 2010.  The crux of the Arbitration is stated to be "[c]ontract dispute; construction defect."  *Id.*

3.4    In addition, three homeowners filed suit against McMillin in Bexar County district court ("Underlying Lawsuits").  (The Jackson, Dal Santo, and Lightfoot plaintiffs in the Underlying Lawsuits will hereinafter be collectively referred to as the "Underlying Plaintiffs.")  The petitions

---

[1] RCLA dictates the steps a homeowner must take before bringing suit against a contractor for construction defects. This allows builders the opportunity to inspect and repair before a homeowner files suit and it limits the awards available under the DTPA.

in the Underlying Lawsuits contain substantially identical allegations (the "Underlying Petitions"). *See, generally,* **Exhibits C-E,** Underlying Petitions.

3.5     Close of escrow on the Jackson home was on January 14, 2010.  The Jackson suit was originally filed on December 17, 2019 by Phillip Jackson and Nicole Jackson and styled Cause No. 2019CI25581; *Phillip Jackson and Nicole Jackson v. McMillin Texas Homes, LLC*; in the 225th Judicial District Court of Bexar County, Texas ("Jackson suit').  *See* **Exhibit C,** Jackson Petition.

3.6     Close of escrow on the Dal Santo home was on May 3, 2010.  The Dal Santo suit was originally filed on April 8, 2020 by Bettina L. Dal Santo and styled Cause No. 2020CI06817; *Bettina L. Dal Santo v. McMillin Texas Homes, LLC*; In the 408th Judicial District Court of Bexar County, Texas ("Dal Santo suit").  *See* **Exhibit D,** Dal Santo Petition.

3.7     The Lightfoot home was purchased as a resale home on December 1, 2017.  The original close of escrow was on April 3, 2012.  Lightfoot claimed the date of occurrence was April 3, 2012.[2] The Lightfoot suit was originally filed on March 11, 2020 by Eric B. Lightfoot and Maria Angelina Lightfoot and styled Cause No. 2020CI05216; *Eric B. Lightfoot and Maria Angelina Lightfoot v. McMillin Texas Homes,* LLC; In the 150th Judicial District Court of Bexar County, Texas ("Lightfoot suit").  *See* **Exhibit F,** Lightfoot Petition.

3.8     Hereinafter, the RCLA Demands, the Arbitration and the Underlying Lawsuits will be collectively referred to as the "Insurance Claims."  The homeowners involved in the Insurance Claims will be collectively referred to as "Claimants."

---

[2] For purposes of a duty to defend under an occurrence-based policy period, damage due to faulty workmanship "occurs" not at the time the damage manifests (when it is discovered or discoverable), nor when the plaintiff is exposed to the agent that will eventually cause the damage (when it is installed, presumably); rather, occurred means *when damage occurred*, not when discovery occurred.  *See Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co*., 267 S.W.3d 20, 24–30 (Tex. 2008).

4

3.9     The Claimants are represented by the same law firm, Florin Roebig, PA, which operates

out of Florida (with one exception:  Timothy Victor, who is represented by the Law Office of Joel

Levine in the Arbitration).  As stated, the allegations in the RCLA Demand Letters and the

Underlying Lawsuits are substantially identical.  *See* section herein entitled "The Insurance

Claims."

3.10    In this lawsuit, Amerisure contends that the Insurance Policies at issue do not provide

coverage for the Insurance Claims submitted to Amerisure by McMillin arising out of the RCLA

Demands, the Arbitration and the Underlying Lawsuits.  Amerisure is requesting a declaratory

judgment from the Court regarding whether there is a duty to defend and indemnify McMillin for

the Insurance Claims under the Policies.

## IV.     APPLICABLE LAW

4.1     In this diversity action, Texas substantive law applies as interpreted by Texas state courts.

*Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 593 (5th Cir. 2011).

4.2     Under Texas law, whether an insurance carrier owes a duty to defend under an insurance

policy is a purely legal question.  *Blanton v. Cont'l Ins. Co.*, 565 Fed. Appx. 330, 333 (5th Cir.

2014) citing *Koenig v. First Am. Title Ins. Co. of Tex.*, 209 S.W.3d 870, 873 (Tex. App.—Houston

[14th Dist.] 2006, no pet.).

4.3     In determining whether an insurer has a duty to defend, Texas courts follow the "eight

corners" rule.  *Ewing Constr. Co. v. Amerisure Ins. Co.*, 420 S.W.3d 30, 33 (Tex. 2014); *Evanston

Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 380 (Tex. 2012).  Under the eight corners rule,

courts look to the facts alleged within the four corners of the pleadings, measure the facts alleged

against the language within the four corners of the insurance policy, and determine if the facts

alleged "present a matter that could potentially be covered by the insurance policy."  *Ewing*

*Constr.*, 420 S.W.3d at 33; *Evanston Ins.*, 370 S.W.3d at 380.  Courts will not read facts into the pleadings, nor look outside the pleadings or imagine factual scenarios that might trigger coverage. *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 655 (Tex. 2009) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 142 (Tex. 1997)).  Courts consider the factual allegations without regard to their truth or falsity and resolve all doubts regarding the duty to defend in the insured's favor.  *Ewing Constr.*, 420 S.W.3d at 33.  In reviewing the pleadings, courts look to the factual allegations showing the origin of the damages claimed, not to the legal theories or conclusions alleged.  *Ewing Constr.*, 420 S.W.3d at 33; *Evanston Ins.*, 370 S.W.3d at 380.  If the pleadings contain even one covered claim, the insurer must defend the entire suit.  *Evanston Ins.*, 370 S.W.3d at 380; *Zurich Am. Ins.*, 268 S.W.3d at 491.

4.4     In limited circumstances, extrinsic evidence may be considered in determining whether a duty to defend exists.  Specifically, the rule adopted by the Texas Supreme Court for when extrinsic evidence may be used in determining an insurer's duty to defend is two-fold:

1.     Where it is initially impossible from the pleadings to discern whether coverage is potentially implicated; and

2.     Where the extrinsic evidence sought to be introduced goes solely to a fundamental issue of coverage which does not overlap with the merits of or engage the truth or falsity of any facts alleged in the underlying case.

*GuideOne Elite Ins. Co. v. Fielder Road Baptist Church*, 197 S.W.3d 305 (Tex. 2006).

4.5     If a petition does not allege facts within the scope of coverage under the insurance policy, the insurer is not legally required to defend a suit against its insured.  *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002) (quoting *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821 (Tex. 1997)); *see Pine Oak Builders*, 279 S.W.3d at 654; *Gen. Star Indem. Co. v. Gulf Coast Marine Assocs., Inc.*, 252 S.W.3d 450, 454 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

Courts construe insurance policies "using ordinary rules of contract interpretation." *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017).   When doing so, courts must determine the parties' intent "as reflected in the terms of the policy itself." *Id.* at 257–58 (quoting *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 831 (Tex. 2009)).   Courts must "examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless."  *Id.* at 258 (quoting *Gilbert Tex. Constr.*, 327 S.W.3d at 126).   No phrase, sentence, or section should be isolated from its setting and considered apart from other contractual provisions. *Id.* (quoting *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994)).   Unless the policy itself dictates otherwise, courts "give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage."  *Id.* (quoting *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015)).

4.6     If the court determines that only one party's interpretation of the policy is reasonable, the policy is unambiguous and the reasonable interpretation should be adopted.  *Id.*  If, however, the court determines that both parties' interpretations are reasonable, the policy is ambiguous.  *Id.*  The Texas Supreme Court has held:

> In that event, "we must resolve the uncertainty by adopting the construction that most favors the insured," and because we are construing a limitation on coverage, we must do so "even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent."

*RSUI Indem. Co.*, 466 S.W.3d at 118 (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991)); *see also Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 668 (Tex. 2008) (" 'Exceptions or limitations on liability are strictly construed against the insurer and in favor of the insured,' and '[a]n intent to exclude coverage must be expressed in clear and unambiguous language.' ") (quoting *Nat'l Union* at 555).

" '[A]mbiguous' means more than simply 'denoting a lack of clarity in language,' " and an insurance policy is not ambiguous simply because the parties offer conflicting interpretations of the policy's provisions. *Nassar*, 508 S.W.3d at 258 (quoting *RSUI Indem. Co.*, 466 S.W.3d at 119). "A policy is ambiguous if it is genuinely subject to more than one meaning after applying the pertinent rules of contract interpretation." *Id.* When interpreting language in an insurance policy, the court must determine whether the insured's interpretation is reasonable. *Id.* If it is, then the court must adopt the insured's interpretation, even if the insurer's interpretation is also, or more, reasonable. *Id.*; *RSUI Indem. Co.*, 466 S.W.3d at 119.

4.7     The insured initially has the burden to plead and prove that the benefits sought are covered by the insurance policy at issue. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. Puget Plastics Corp.*, 532 F.3d 398, 401 (5th Cir. 2008). The insurer bears the burden of establishing that one of the policy's limitations or exclusions constitutes an avoidance or affirmative defense to coverage. *See id*. at 404. Once the insurer demonstrates that an exclusion arguably applies, the burden then shifts back to the insured to show that the claim does not fall within the exclusion or that it comes within an exception to the exclusion. *See Century Surety Co. v. Hardscape Constr. Specialties, Inc.*, 578 F.3d 262, 265 (5th Cir. 2009).

4.8     When construing an insurance policy, we should read the policy and its endorsements together "unless they are so much in conflict they cannot be reconciled." *TIG Ins. Co. v. N. Am. Van Lines, Inc.*, 170 S.W.3d 264, 271 (Tex. App.—Dallas 2005, no pet.). In the case of an irreconcilable conflict, endorsements to a policy generally supersede and control over conflicting printed terms contained within the main policy. *Id.*; *see also TIG Ins. Co. v. San Antonio YMCA*, 172 S.W.3d 652, 658 (Tex. App.—San Antonio 2005, no pet.) (stating that endorsements "often are issued to add coverages that otherwise would be excluded," but noting that endorsements

8

"cannot be read apart from the main policy" and that added provisions in endorsements only supersede previous policy terms "to the extent they are truly in conflict").

4.9     The duty to defend and the duty to indemnify "are distinct and separate duties," and one duty may exist without the other.   *D.R. Horton-Tex., Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 743 (Tex. 2009) (quoting *Utica Nat'l Ins. Co. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004)); *Farmers Tex. Cty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex. 1997).   An insurer may have a duty to indemnify even if a duty to defend never arises. *D.R. Horton-Tex., 300 S.W.3d at* 744.   An insurer's duty to indemnify is controlled by the "facts actually established in the underlying suit" against the insured and "whether the damages caused by the actions or omissions proven are covered by the terms of the policy." *D.R. Horton-Tex.*, 300 S.W.3d at 744.

4.10     Typically, the court considering the coverage dispute will consider additional evidence needed to establish whether there was coverage in the underlying suit, particularly if the underlying case is resolved without a trial on the merits. *D.R. Horton–Tex., Ltd.*, 300 S.W.3d at 744; *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. Puget Plastics Corp.*, 532 F.3d 398, 404 (5th Cir. 2008) (holding that the trial court can consider evidence regarding facts required to determine coverage that were not adjudicated in the underlying litigation).   The trial court is authorized to make factual findings necessary to resolve coverage. *See Puget Plastics Corp.*, 532 F.3d at 404.

1.1     Generally, Texas law only considers the duty-to-indemnify question justiciable after the underlying suit is concluded, unless "*the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify.*" *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 529 (5th Cir. 2004) citing *Farmers Tex. County Mut. Ins. Co. v. Griffin,* 955 S.W.2d 81, 84 (Tex.1997).   The insurer and the insured may introduce evidence in

coverage litigation to establish or refute the insurer's duty to indemnify.  *D.R. Horton-Tex., Ltd. v. Markel Intern. Ins. Co., Ltd.*, 300 S.W.3d 740, 745 (Tex. 2009).

## II.     "EIGHT CORNERS" ANALYSIS

2.1     Looking at the "eight corners" of the Underlying Petitions and the Policies, the allegations arise out of the faulty workmanship of McMillin's subcontractors in constructing the "artificial stucco" exterior finish on the Homes and are excluded by the "your work" exclusion found in the CG2294 Endorsement to the Policies, among other exclusions discussed *infra*.  The "your work" exclusion excludes property damage to the insured's completed work arising out of it or any part of it.  Thus, the Insurance Claims fall outside the scope of coverage of the Insurance Policies.  The duty to defend is triggered by a suit seeking damages covered by the insurance.  Here, there is no duty to defend McMillin because the allegations in the Underlying Petitions, taken as true, are excluded by the Policies.

2.2     The duty to defend is broader than the duty to indemnify and separate from the duty to indemnify.  The duty to indemnify is triggered when the insured becomes legally obligated to pay damages because of covered property damage.  Here, the same reasons which negate the duty to defend also negate the duty to indemnify.  Namely, the property damage to McMillin's completed work is not covered by the Policies due to the "your work" exclusion, among others.  Thus, there is no duty to indemnify McMillin.

2.3     **In sum, the "eight corners" rule means Amerisure has no duty to defend McMillin because the Insurance Claims fall outside the scope of coverage of the Insurance Policies.  No facts can be developed in the Underlying Lawsuits that can transform the faulty workmanship claims into a covered occurrence.  There is no coverage, therefore, there is no**

**duty to defend and the same reasons that negate the duty to defend also negate the duty to indemnify**.

### III.   THE INSURANCE CLAIMS

3.1   The RCLA Demands involve the alleged faulty construction of homes, notably code violations pertaining to the stucco finish.  The RCLA Demands allege damages "on the exterior stucco finish of the residence[s]" and claim "the stucco observed at the residence[s] was not installed in accordance with the code in effect at the time of the original construction."  *See,* generally, **Exhibit A,** RCLA Demands.  The RCLA Demands are essentially claims of faulty workmanship.

3.2   The Underlying Lawsuits are more detailed, of course, but they also involve the same alleged design and construction defects, namely, an inadequately and improperly installed stucco system.  Specifically, the Underlying Plaintiffs assert claims against McMillin for breach of contract, negligence, negligence *per se* for violation of local and state building codes including ASTM Standards, negligent misrepresentation, and knowing and/or intentional violations of Deceptive Trade Practices-Consumer Protection Act ("DTPA").  The allegations in the Underlying Lawsuits are substantially identical.  *See*, generally, **Exhibits C-E**, Underlying Petitions.

3.3   The Underlying Plaintiffs claim:

- Subsequent to construction of the Home, certain design and construction deficiencies were observed at the Home which include, but are not limited to, an inadequately and improperly installed stucco system.

- Damages were proximately caused by the improper design and/or construction of the Home, which has resulted in numerous defects and deficiencies in the various systems and components in the Home, including violations of local and state building codes.

- The Home has suffered damages to the exterior stucco, underlying wire lath, paper backing, water resistive barriers, sheathing, interior walls, interior floors

and/or other property which reduce the value of the Home and/or require repairs to correct the defects.[3]

- **Breach of Contract** – McMillin agreed to construct the Home in accordance with plans and specifications incorporated into the contract and violated the contract by constructing the home in a defective and poor workmanlike manner, violating the Texas Building Code, and deviating from the construction plans.

- **Negligence *Per Se*** – McMillin violated local building codes and the Texas Building Code, including the applicable ASTM Standards, by inadequately and improperly installing the stucco system on the Home.

- **Negligence** – McMillin breached its nondelegable duty to design, construct, sell and/or repair the Home in accordance with all plans, specifications, design professional recommendations, manufacturers installation instructions, building codes, industry standards, and government agency requirements ("Requirements").

- **Negligence** – McMillin breached its nondelegable duty to ensure the Home was designed and performed in a good and workmanlike manner and was suited for its reasonable anticipated use.

- **Negligent Misrepresentation** – McMillin made material oral and/or written representations that the Home was built in a good and workmanlike manner, free from defects and suited for its intended use which were false and *intended* to induce Underlying Plaintiffs into the business transaction, and *intended* that Underlying Plaintiffs would rely on the false information.

- **Negligent Misrepresentation** – McMillin *knowingly* caused or permitted the material and false information to be communicated to Underlying Plaintiffs with reckless disregard.

- **Negligent Misrepresentation** – McMillin had a duty to disclose the adverse material facts and information in an understandable and clear manner but negligently failed to exercise reasonable care in doing so.

- **DTPA** – McMillin *knowingly* and/or *intentionally* represented that the materials and/or services used to construct the Home were of a particular standard, quality or grade when McMillin *knew* or should have known they did not have such characteristics and/or they were of another standard.

- **DTPA** – McMillin *knowingly* and/or *intentionally* represented that the Home was built in a workmanlike manner and in accordance with all Requirements

---

[3] The expert reports submitted to Amerisure only discuss removal and replacement of the stucco.  *See* **Exhibit F**, Expert Reports.

and was free from defects and suited for its intended use when it *knew* or should have known that it was not.

- **DPTA** – McMillin *knew* but failed to disclose material information concerning materials and services at the time of construction and sale of the Home, which was *intended* to induce Underlying Plaintiffs into purchasing the Home.

- **DTPA** – McMillin *knowingly* and/or *intentionally* advertised the goods and services with intent not to sell them as advertised.

- **DTPA** – McMillin *knowingly* and/or *intentionally* breached an implied warranty.

- **DTPA** – McMillin *knowingly* and/or *intentionally* engaged in an unconscionable action or course of action.

*See* **Exhibits C-E**, Underlying Petitions.

3.4    The Underlying Plaintiffs seek damages for repair costs, relocation expenses, remediation costs, benefit-of-the-bargain loss, decline in home value due to stigma, and mental anguish.  The Underlying Plaintiffs also seek attorney's fees, court costs, expert fees, travel costs, pre- and post-judgment interest, and exemplary damages.  The Underlying Plaintiffs seek treble economic and mental anguish damages under the DTPA (TEX. BUS. & COMM. CODE § 17.50) in addition to costs and attorney's fees.

3.5    McMillin tendered the RCLA Demands, the Arbitration, and the Underlying Lawsuits (collectively, "Insurance Claims") to its insurer, Amerisure, seeking defense and indemnity under the Insurance Policies for the Insurance Claims.

## IV.    THE POLICIES

4.1    Insurance policies provide either first or third-party coverage.  First-party coverage protects the insured and its assets against loss or damage and a first-party claim is when an insured seeks recovery for its own loss.  *See Hartman v. St. Paul Fire & Marine Ins. Co.*, 55 F. Supp. 2d 600, 603 (N.D. Tex. 1998); *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 53 n.2 (Tex. 1997).  An

example of first-party coverage is a Builder's Risk policy commonly issued to homebuilders. Builders' Risk is usually issued to insure a building only during the course of the construction period and perhaps for a short additional period after the construction is completed. *Data Specialties, Inc. v. Transcontinental Insurance Co.*, 125 F.3d 909, 913 (5th Cir. 1997). This is the type of policy that would cover the allegations of faulty workmanship in the Underlying Lawsuits.

4.2     In contrast, third-party coverage provides coverage for claims made against the insured by third parties for damage to the third party's property. An example of third-party coverage is the CGL policy. A CGL policy protects the contractor and owner in the event an accident on the jobsite causes property damage or personal injury to a third-person. A CGL policy is not designed to cover damages to the work product of named insureds. Rather, CGL coverage applies to the repair, replacement, or restoration of otherwise non-defective work that is damaged as a result of defective construction. *See Basic Energy Servs.*, 2009 WL 2998134 at *10; *Gar-Tex Constr. Co. v. Employers Cas. Co.*, 771 S.W.2d 639, 643–44 (Tex. App.—Dallas 1989, writ denied); *Dorchester Dev. Corp. v. Safeco Ins. Co.*, 737 S.W.2d 380, 382 (Tex. App.—Dallas 1987, no writ). That is not the scenario in this case. Here, the damage alleged arises out of the insured's defective construction work and is excluded by the endorsements and exclusions of the Policies.

4.3     Amerisure issued a series of Commercial General Liability policies to McMillin as follows:

| Exhibit # | Effective Dates | Policy Number |
|---|---|---|
| G | 04/26/2009 - 04/26/2010 | CPP2061173010000 |
| H | 04/26/2010 - 04/26/2011 | CPP2061173020010 |
| I | 04/26/2011 - 04/26/2012 | CPP2061173030011 |
| J | 04/26/2012 - 04/26/2013 | CPP2061173040012 |
| K | 04/26/2013 - 04/26/2014 | CPP2061173050013 |

| L | 04/26/2014 - 04/26/2015 | CPP20611730602 |
|---|---|---|

(collectively, the "Policies").  Amerisure has attached the policies in their entirety as mandated by Texas law, which requires that a contract be construed as a whole.

4.4     The Policies contain identical coverage forms.  *See* Declarations Page contained in each Policy.  Thus, all Insurance Claims are subject to the same scope of coverage.

## V.     COVERAGE A – NO TRIGGER OF COVERAGE

5.1     In the Underlying Lawsuits, the Underlying Plaintiffs claim:

- Subsequent to construction of the Home, certain design and construction deficiencies were observed at the Home which include, but are not limited to, an inadequately and improperly installed stucco system.

- Damages were proximately caused by the improper design and/or construction of the Home, which has resulted in numerous defects and deficiencies in the various systems and components in the Home, including violations of local and state building codes.

- The Home has suffered damages to the exterior stucco, underlying wire lath, paper backing, water resistive barriers, sheathing, interior walls, interior floors and/or other property which reduce the value of the Home and/or require repairs to correct the defects.

- **Breach of Contract** – McMillin agreed to construct the Home in accordance with plans and specifications incorporated into the contract and violated the contract by constructing the home in a defective and poor workmanlike manner, by violating the Texas Building Code, and by deviating from the construction plans.

- **Negligence *Per Se*** – McMillin violated local building codes and the Texas Building Code, including the applicable ASTM Standards, by inadequately and improperly installing the stucco system on the Home.

- **Negligence** – McMillin breached its nondelegable duty to design, construct, sell and/or repair the Home in accordance with all plans, specifications, design professional recommendations, manufacturers installation instructions, building codes, industry standards, and government agency requirements ("Requirements").

- **Negligence** – McMillin breached its nondelegable duty to ensure the Home was designed and performed in a good and workmanlike manner and was suited for its reasonable anticipated use.

- **Negligent Misrepresentation** – McMillin made material oral and/or written representations that the Home was built in a good and workmanlike manner, free from defects and suited for its intended use which were false and *intended* to induce Underlying Plaintiffs into the business transaction, and *intended* that Underlying Plaintiffs would rely on the false information.

- **Negligent Misrepresentation** – McMillin *knowingly* caused or permitted the material and false information to be communicated to Underlying Plaintiffs with reckless disregard.

- **Negligent Misrepresentation** – McMillin had a duty to disclose the adverse material facts and information in an understandable and clear manner but negligently failed to exercise reasonable care in doing so.

- **DTPA** – McMillin *knowingly* and/or *intentionally* represented that the materials and/or services used to construct the Home were of a particular standard, quality or grade when McMillin *knew* or should have known they did not have such characteristics and/or they were of another standard.

- **DTPA** – McMillin *knowingly* and/or *intentionally* represented that the Home was built in a workmanlike manner and in accordance with all Requirements and was free from defects and suited for its intended use when it *knew* or should have known that it was not.

- **DPTA** – McMillin *knew* but failed to disclose material information concerning materials and services at the time of construction and sale of the Home, which was *intended* to induce Underlying Plaintiffs into purchasing the Home.

- **DTPA** – McMillin *knowingly* and/or *intentionally* advertised the goods and services with intent not to sell them as advertised.

- **DTPA** – McMillin *knowingly* and/or *intentionally* breached an implied warranty.

- **DTPA** – McMillin *knowingly* and/or *intentionally* engaged in an unconscionable action or course of action.

*See* **Exhibits C-E**, Underlying Lawsuits.

5.2 The RCLA Demands concern the damages "on the exterior stucco finish of the residence[s]" and claim "the stucco observed at the residence was not installed in accordance with

the code in effect at the time of the original construction" and "shall be removed and replaced."

*See* **Exhibit A**, RCLA Demands.

5.3    In sum, the RCLA Demands allege damages to the exterior stucco finish which was not installed in accordance with code.  Similarly, the Underlying Plaintiffs claim the stucco system was improperly designed and constructed which resulted in defects to various systems and components of the home.

5.4    In "Coverage A," the Commercial General Liability Coverage Form (CG 00 01) contains the following trigger of coverage:

> Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.
>
> The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.   …
>
> COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY
>
> 1.    Insuring Agreement
>
>    a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.  …
>
>    b.    This insurance applies to "bodily injury" and "property damage" only if:
>
>       (1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"
>
>       (2)    The "bodily injury" or "property damage" occurs during the policy period; and
>
>       (3)    Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or

"property damage" had occurred, in whole or in part.  If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c.  "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d.  "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1)  Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2)  Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3)  Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.  …

…

13.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

…

17.  "Property damage" means:

a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.  …

18.  "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

    a.      An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

    b.      Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

5.5    As stated, the duty to defend and indemnify are separate.  The Insuring Agreement states the insurer will pay sums the insured becomes legally obligated to pay as damages because of covered "property damage" (*the duty to indemnify*).  In addition, the insurer will have the *duty to defend* the insured against any "suit" seeking those damages to which the insurance applies.  In order for the insurance to apply, the "property damage" must be caused by an "occurrence" that takes place in the "coverage territory" during the policy period and was not known by an Insured or authorized employee prior to the policy period.  These elements were not satisfied here and are discussed below.

### 1.     REQUIREMENT OF "PROPERTY DAMAGE"

5.6    The Policies define "property damage" as physical injury to tangible property, including resulting loss of use.  The Claimants allege damages caused by McMillin's faulty workmanship in designing and constructing the stucco system.  The Claimants do not allege damage to personal property nor assert claims for "loss of use."  Any alleged "property damage" is subject to the remainder of the Policies, including exclusions and endorsements, which will be discussed herein.

### 2.     REQUIREMENT OF "SUIT"

5.7    The Policies define "suit" as: "a civil proceeding in which damages because of bodily injury or property damage or personal and advertising injury to which this insurance applies are alleged.  Suit includes an arbitration proceeding or any other alternative dispute resolution

19

proceeding in which such damages are claimed and to which the insured submits with Amerisure's consent.

5.8     The Underlying Petitions are "suits" but are also subject to the remainder of the Policies, including exclusions and endorsements, which will be discussed herein.

5.9     The RCLA Demands are not lawsuits, arbitration or ADR process[es] to which Amerisure has consented.   The RCLA Demands do not meet the Policies' definition of "suits."   Thus, **the RCLA Demands have not triggered the duty to defend McMillin**.

5.10    McMillin is not legally obligated to pay the RCLA Demands and the insurance does not apply to the RCLA Demands because they are not "suits."   **Accordingly, there is no duty to indemnify McMillin for the RCLA Demands**.

## 3.     REQUIREMENT OF "OCCURRENCE"

5.11    To establish coverage under the CGL contract, the insured must demonstrate an "occurrence" causing "property damage," meaning injury to tangible property.   *Crownover v. Mid-Continent Cas. Co.*, 772 F.3d 197, 205 (5th Cir. 2014) citing *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.,* 267 S.W.3d 20, 23–24 (Tex. 2008).   "Occurrence" means an accident, as opposed to an injury that was expected or intended by the insured.

5.12    "[A]n insured's conduct is an occurrence if it:  (1) qualifies as an accident and (2) results in harm that the insured did not expect or intend."   *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Puget Plastics Corp.*, 532 F.3d 398, 401–02 (5th Cir. 2008) aff'd, 454 Fed. Appx. 291 (5th Cir. 2011).   In essence, the Fifth Circuit simplified the entire "occurrence" definition into three specific "non-occurrence" scenarios.   An insured's deliberate actions are not an "occurrence" if:

(1)     the injury to the plaintiff was highly probable;

(2)     the insured intended or expected the injury inflicted on the plaintiff; or

(3)      the insured committed an intentional tort, in which case the intent to harm
the plaintiff would be presumed.

*Nat'l Union Fire Ins. Co. v. Puget Plastics Corp.*, 649 F.Supp.2d 613, 630 (S.D.Tex. 2009) aff'd,

454 Fed. Appx. 291 (5th Cir. 2011).

5.13     The Court shall use an objective standard with respect to its determination of whether the

injury was "highly probable." *Puget Plastics*, 649 F. Supp. 2d at 630–31 ("objective highly

probable standard" applied to determine "occurrence").  The determination of whether an insured's

faulty workmanship was intended or accidental is dependent on the facts and circumstances of the

particular case.  *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 9 (Tex. 2007).

5.14     Thus, McMillin cannot recover under the Policies if: (1) the injury was objectively highly

probable, (2) McMillin intended or expected the injury, or (3) McMillin committed an intentional

tort.  Here, it was highly probable, and a reasonable homebuilder would have known it was highly

probable, that the substandard materials and methods utilized in building the stucco system on the

homes made the exterior surfaces likely to fail; therefore, McMillian's actions were not an

"occurrence" under the Policies.  **An occurrence is required to trigger the duty to defend; the**

**lack thereof negates the duty to defend**.

5.15     Likewise, the Policies require an "occurrence" to trigger the duty to indemnify.  The same

facts that negate the duty to defend also negate the duty to indemnify.  The probability that the

substandard materials and methods used in constructing the artificial stucco system would cause

it to fail means there has not been an "occurrence" pursuant to the Policies.  This means there is

**no duty to indemnify McMillin for the Insurance Claims which arise out of and are based**

**upon the faulty design and construction of the stucco system(s)**.

5.16     In addition, to the extent the Underlying Lawsuits allege conduct on the part of McMillin

that was knowing or intentional, i.e., not accidental, there would be no "occurrence" as required

for coverage under the Policies.  **There is thus no duty to defend McMillin for knowing or intentional conduct.**  (*See*, *infra*, "Expected or Intended Injury Exclusion.")

5.17    Based on an objective standard, it was highly probable, and a reasonable homebuilder would have known it was highly probable, that the substandard materials and methods utilized in building the stucco system on the homes made the exterior surfaces likely to fail.  Thus, **there is no duty to indemnify McMillin for knowing or intentional conduct** because an "occurrence," or accident, is required for the insurance to apply.

## VI.    POLICY EXCLUSIONS

6.1    The Policies provide that Amerisure will indemnify McMillin for sums that it becomes legally obligated to pay as damages because of accidental "property damage" covered under the Policies.  Further, Amerisure will have the right and duty to defend the insured against any "suit" seeking those damages.

6.2    The CGL's insuring agreement grants the insured broad coverage for property damage and bodily injury liability, which is then narrowed by exclusions that "restrict and shape the coverage otherwise afforded." *Lamar Homes, Inc. v. Mid-Continent Cas. Co*., 242 S.W.3d 1, 10 (Tex. 2007). Exclusions exist for intended or expected losses, as well as for a number of so-called "business risks." *Id.* citing 9 Lee R. Russ & Thomas F. Segalla, Couch on Insurance §§ 129:10–129:34 (3d ed.1997); 2 Windt §§ 11:9–11.22.

6.3    The CGL Policies contain various endorsements and exclusions that preclude Amerisure's duty to defend and indemnify McMillin for the Insurance Claims.

### A.    "EXPECTED OR INTENDED INJURY" – EXCLUSION A

6.4    The Underlying Lawsuits allege the following knowing or intentional conduct:

- **Negligent Misrepresentation** – McMillin made material oral and/or written representations that the Home was built in a good and workmanlike manner, free from defects and suited for its intended use which were false and *intended* to induce Underlying Plaintiffs into the business transaction, and *intended* that Underlying Plaintiffs would rely on the false information.

- **Negligent Misrepresentation** – McMillin *knowingly* caused or permitted the material and false information to be communicated to Underlying Plaintiffs with reckless disregard.

- **DTPA** – McMillin *knowingly* and/or *intentionally* represented that the materials and/or services used to construct the Home were of a particular standard, quality or grade when McMillin *knew* or should have known they did not have such characteristics and/or they were of another standard.

- **DTPA** – McMillin *knowingly* and/or *intentionally* represented that the Home was built in a workmanlike manner and in accordance with all Requirements and was free from defects and suited for its intended use when it *knew* or should have known that it was not.

- **DPTA** – McMillin *knew* but failed to disclose material information concerning materials and services at the time of construction and sale of the Home, which was *intended* to induce Underlying Plaintiffs into purchasing the Home.

- **DTPA** – McMillin *knowingly* and/or *intentionally* advertised the goods and services with intent not to sell them as advertised.

- **DTPA** – McMillin *knowingly* and/or *intentionally* breached an implied warranty.

- **DTPA** – McMillin *knowingly* and/or *intentionally* engaged in an unconscionable action or course of action.

*See* **Exhibits C-E**, Underlying Petitions.

6.5   The Policies issued to McMillin exclude "expected or intended injury" as follows:

**2.       Exclusions**

This insurance does not apply to:

**a.       Expected Or Intended Injury**

… "property damage" expected or intended from the standpoint of the insured.  …

6.6     An "occurrence" means an accident.  As discussed above, "property damage" that is "expected or intended" does not qualify as an "occurrence" and thus, does not trigger the duty to defend or indemnify.

6.7     Additionally, the Policies have an exclusion for "property damage" that was *expected or intended* by McMillin.  McMillin should have expected the substandard materials and methods utilized in building the stucco on the homes would make the exterior surfaces likely to fail and cause the alleged damages, thus, McMillian's actions constitute "expected or intended injury" which is excluded under the Policies.

6.8     In order for Amerisure to have a duty to defend, the insurance must apply to the alleged "property damage."  The Policies exclude "property damage" that was expected or intended. **Thus, there is no duty to defend McMillin for expected or intended "property damage."**

6.9     The Policy provides a duty to indemnify for sums the insured becomes legally obligated to pay as damages because of "property damage" to which the insurance applies.  The Policy does not apply to "property damage" that was expected or intended.  **Thus, there is no duty to indemnify McMillin for expected or intended "property damage."**

## B.     FAULTY WORKMANSHIP EXCLUSIONS

6.10    Faulty workmanship will be excluded from coverage by specific exclusions because that is the CGL's structure.  *Lamar Homes, Inc. v. Mid-Continent Cas. Co*., 242 S.W.3d 1, 10 (Tex. 2007) citing 2 Stempel on Insurance Contracts § 14.01 (emphasis added).  CGL policies protect an insured when his work damages *a third-party's property*, but they do not serve as "a performance bond covering an insured's own work."  *VRV Dev. L.P. v. Mid-Continent Cas. Co*., 630 F.3d 451, 457 (5th Cir. 2011) quoting *Wilshire Ins. Co. v. RJT Const., LLC*, 581 F.3d 222, 226 (5th Cir. 2009).

6.11    The exclusions in the Policies pertaining to *faulty workmanship* will be discussed below.

### 1.    "DAMAGE TO YOUR PRODUCT" – EXCLUSION K

6.12    In the Underlying Lawsuits, the Underlying Plaintiffs claim:

- Subsequent to construction of the Home, certain design and construction deficiencies were observed at the Home which include, but are not limited to, an inadequately and improperly installed stucco system.

- Damages were proximately caused by the improper design and/or construction of the Home, which has resulted in numerous defects and deficiencies in the various systems and components in the Home, including violations of local and state building codes.

- The Home has suffered damages to the exterior stucco, underlying wire lath, paper backing, water resistive barriers, sheathing, interior walls, interior floors and/or other property which reduce the value of the Home and/or require repairs to correct the defects.

- **Breach of Contract** – McMillin agreed to construct the Home in accordance with plans and specifications incorporated into the contract and violated the contract by constructing the home in a defective and poor workmanlike manner, by violating the Texas Building Code, and by deviating from the construction plans.

- **Negligence *Per Se*** – McMillin violated local building codes and the Texas Building Code, including the applicable ASTM Standards, by inadequately and improperly installing the stucco system on the Home.

- **Negligence** – McMillin breached its nondelegable duty to design, construct, sell and/or repair the Home in accordance with all plans, specifications, design professional recommendations, manufacturers installation instructions, building codes, industry standards, and government agency requirements ("Requirements").

- **Negligence** – McMillin breached its nondelegable duty to ensure the Home was designed and performed in a good and workmanlike manner and was suited for its reasonable anticipated use.

- **Negligent Misrepresentation** – McMillin made material oral and/or written representations that the Home was built in a good and workmanlike manner, free from defects and suited for its intended use which were false and *intended* to induce Underlying Plaintiffs into the business transaction, and *intended* that Underlying Plaintiffs would rely on the false information.

- **Negligent Misrepresentation** – McMillin *knowingly* caused or permitted the material and false information to be communicated to Underlying Plaintiffs with reckless disregard.

- **Negligent Misrepresentation** – McMillin had a duty to disclose the adverse material facts and information in an understandable and clear manner but negligently failed to exercise reasonable care in doing so.

- **DTPA** – McMillin *knowingly* and/or *intentionally* represented that the materials and/or services used to construct the Home were of a particular standard, quality or grade when McMillin *knew* or should have known they did not have such characteristics and/or they were of another standard.

- **DTPA** – McMillin *knowingly* and/or *intentionally* represented that the Home was built in a workmanlike manner and in accordance with all Requirements and was free from defects and suited for its intended use when it *knew* or should have known that it was not.

- **DPTA** – McMillin *knew* but failed to disclose material information concerning materials and services at the time of construction and sale of the Home, which was *intended* to induce Underlying Plaintiffs into purchasing the Home.

- **DTPA** – McMillin *knowingly* and/or *intentionally* advertised the goods and services with intent not to sell them as advertised.

- **DTPA** – McMillin *knowingly* and/or *intentionally* breached an implied warranty.

- **DTPA** – McMillin *knowingly* and/or *intentionally* engaged in an unconscionable action or course of action.

*See* **Exhibits C-E**, Underlying Lawsuits.

6.13   Because a CGL policy is not designed to insure against *faulty workmanship*, these allegations are excluded from coverage. Accordingly, the CGL Coverage Form (CG 00 01 12 07) contains the following exclusion:

> **2.   Exclusions**
>
> This insurance does not apply to: …
>
> > **k.   Damage To Your Product**
> >
> > "Property damage" to "your product" arising out of it or any part of it.
>
> …
>
> 21.   "Your product":

a.   Means:

    (1)   Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

        (a)   You;

        (b)   Others trading under your name; or

        (c)   A person or organization whose business or assets you have acquired; and

    (2)   Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b.   Includes:

    (1)   Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    (2)   The providing of or failure to provide warnings or instructions.

…

6.14    The Policies exclude "property damage" to "your product" arising out of it or any part of it.  "Your product" is defined as goods or products manufactured or sold by McMillin including representations made as to quality.   The homes sold by McMillin to Claimants constitute McMillin's "product."   Claims for "property damage" to the homes as well as claims regarding misrepresentations would fall under this exclusion.  Thus, to the extent McMillin claims Amerisure has a duty to defend or indemnify arising out of "property damage" to the faulty product—the cost of remedying the defective stucco—that claim is precluded by the "your product" exclusion as a matter of law.  *See Bldg. Specialties, Inc. v. Liberty Mut. Fire Ins. Co.*, 712 F. Supp. 2d 628, 647 (S.D. Tex. 2010).

6.15    All of the allegations made the basis of the Insurance Claims arise out of "property damage" to McMillin's "product" [the Homes] including representations as to quality.  These allegations are excluded by the "your product" exclusion, thus **there is no duty to defend**

**McMillin for allegations of "property damage" to the Home(s) including representations as to quality.**

6.16    The duty to indemnify arises under the Policies when the insured becomes legally obligated to pay damages for covered "property damage."  The factual scenario and all of the allegations in the Underlying Petitions consist of "property damage" to McMillin's "product" arising out of it or any part of it, including representations as to quality.  Because "property damage" to McMillin's "product," including representations as to quality, is excluded by the Policies, the insurance does not apply and **there is no duty to indemnify McMillin for the Underlying Lawsuits.**

## 2.      "YOUR WORK" – EXCLUSION L (CG2294)

6.17    In the Underlying Lawsuits, the Underlying Plaintiffs claim:

- Subsequent to construction of the Home, certain design and construction deficiencies were observed at the Home which include, but are not limited to, an inadequately and improperly installed stucco system.

- Damages were proximately caused by the improper design and/or construction of the Home, which has resulted in numerous defects and deficiencies in the various systems and components in the Home, including violations of local and state building codes.

- The Home has suffered damages to the exterior stucco, underlying wire lath, paper backing, water resistive barriers, sheathing, interior walls, interior floors and/or other property which reduce the value of the Home and/or require repairs to correct the defects.

- **Breach of Contract** – McMillin agreed to construct the Home in accordance with plans and specifications incorporated into the contract and violated the contract by constructing the home in a defective and poor workmanlike manner, by violating the Texas Building Code, and by deviating from the construction plans.

- **Negligence *Per Se*** – McMillin violated local building codes and the Texas Building Code, including the applicable ASTM Standards, by inadequately and improperly installing the stucco system on the Home.

- **Negligence** – McMillin breached its nondelegable duty to design, construct, sell and/or repair the Home in accordance with all plans, specifications, design professional recommendations, manufacturers installation instructions, building codes, industry standards, and government agency requirements ("Requirements").

- **Negligence** – McMillin breached its nondelegable duty to ensure the Home was designed and performed in a good and workmanlike manner and was suited for its reasonable anticipated use.

- **Negligent Misrepresentation** – McMillin made material oral and/or written representations that the Home was built in a good and workmanlike manner, free from defects and suited for its intended use which were false and *intended* to induce Underlying Plaintiffs into the business transaction, and *intended* that Underlying Plaintiffs would rely on the false information.

- **Negligent Misrepresentation** – McMillin *knowingly* caused or permitted the material and false information to be communicated to Underlying Plaintiffs with reckless disregard.

- **Negligent Misrepresentation** – McMillin had a duty to disclose the adverse material facts and information in an understandable and clear manner but negligently failed to exercise reasonable care in doing so.

- **DTPA** – McMillin *knowingly* and/or *intentionally* represented that the materials and/or services used to construct the Home were of a particular standard, quality or grade when McMillin *knew* or should have known they did not have such characteristics and/or they were of another standard.

- **DTPA** – McMillin *knowingly* and/or *intentionally* represented that the Home was built in a workmanlike manner and in accordance with all Requirements and was free from defects and suited for its intended use when it *knew* or should have known that it was not.

- **DPTA** – McMillin *knew* but failed to disclose material information concerning materials and services at the time of construction and sale of the Home, which was *intended* to induce Underlying Plaintiffs into purchasing the Home.

- **DTPA** – McMillin *knowingly* and/or *intentionally* advertised the goods and services with intent not to sell them as advertised.

- **DTPA** – McMillin *knowingly* and/or *intentionally* breached an implied warranty.

- **DTPA** – McMillin *knowingly* and/or *intentionally* engaged in an unconscionable action or course of action.

*See* **Exhibits C-E**, Underlying Lawsuits.

6.18    McMillin did not perform any of the work in building the Homes, but rather utilized subcontractors.  In the construction industry, subcontractors are generally required to defend, indemnify, and hold harmless general contractors and name them as Additional Insureds on their insurance policies.  With this in mind, and because McMillin did not self-perform any construction work, the Policies contain an endorsement (CG 22 94 10 01) excluding damage to McMillin's work as follows:

>    **2.    Exclusions**
>
> This insurance does not apply to:
>
> >    **l.    Damage To Your Work**
> >
> > "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
> >
> > …
>
> SECTION V – DEFINITIONS
>
> 16.    "Products-completed operations hazard":
>
> >    a.    Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
> >
> > >    (1)    Products that are still in your physical possession; or
> > >
> > >    (2)    Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
> > >
> > > >    (a)    When all of the work called for in your contract has been completed.
> > > >
> > > >    (b)    When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
> > > >
> > > >    (c)    When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
> > >
> > > Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

      b.     Does not include "bodily injury" or "property damage" arising out of:

          …

          (3)     Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

…

22.     "Your work":

      a.     Means:

          (1)     Work or operations performed by you or on your behalf; and

          (2)     Materials, parts or equipment furnished in connection with such work or operations.

      b.     Includes:

          (1)     Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

          (2)     The providing of or failure to provide warnings or instructions.

("CG2294" Endorsement).

6.19    The Insurance Claims are barred by the "Damage to Your Work" exclusion because the Insurance Claims are for "property damage" to McMillin's "work" arising out of it or any part of it and included in the "products-completed operations hazard."

6.20    The 'your work' exclusion prevents a CGL policy from morphing into a performance bond covering an insured's own work." *Wilshire Ins. Co. v. RJT Const., LLC*, 581 F.3d 222, 226 (5th Cir. 2009).  Faulty workmanship will be excluded from coverage by specific exclusions because that is the CGL's structure. *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 10 (Tex. 2007) citing 2 Stempel on Insurance Contracts § 14.01.  Texas courts have routinely upheld the

insurer's denial of the duty to defend and indemnify pursuant to CGL policies containing the CG2294 Endorsement.[4]

6.21    Pursuant to the CG2294 Endorsement, there is no coverage under the Policies for "property damage" to work performed by McMillin or on its behalf (including representations made as to quality) arising out of it or any part of it, and included in the "products-completed operations hazard." "Products-completed operations hazard" means work that has been completed or put to its intended use; work that may need repair but which is otherwise complete, will be treated as completed.  In other words, the CG2294 Endorsement precludes coverage for *damage to the insured's completed work*.

6.22    Here, the homes containing the alleged defects constitute McMillin's finished work, or "products-completed operations."  Pursuant to the terms of the policy(ies), once the homes were completed, McMillin's work was "completed."  After close of escrow, the homes were "put to

---

[4] *Patton v. Mid-Continent Cas. Co*., 2016 WL 11474778 at *2,7 (S.D. Tex. June 13, 2016) report and recommendation adopted, 2016 WL 3900799 (S.D. Tex. July 19, 2016) (no duty to indemnify arbitration award due to CG2294 exclusion which eliminated the subcontractor exception and exclusion (j)(5); exclusion (l) imposes no limitation on what type of entity might be performing work on the insured's behalf; "…CGL policies do not cover damage to the insured's work or to work performed on the insured's behalf regardless of when the damage occurred because that is not the purpose of CGL coverage."); *Feaster v. Mid-Continent Cas. Co*., 2015 WL 164041 at *5 (S.D. Tex. Jan. 13, 2015), aff'd, 620 Fed. Appx. 300, 302 (5th Cir. 2015) (CG2294 exclusion barred indemnity for default judgment; the "your work" exclusion without the exception is neither unconscionable nor unenforceable under Texas law; "your work" exclusion prevents a CGL policy from morphing into a performance bond covering an insured's own work); *Oklahoma Sur. Co. v. Noviello*, 2014 WL 7497987 at *3 (Tex. App.—Dallas Dec. 29, 2014, no pet.) (CG2294 exclusion specifically excludes duty to defend/indemnify for damage to work completed by insureds or on their behalf without regard to whether work was defective; "CGL policies generally protect the insured only for claims regarding damage to another's property and do not serve as performance bonds for the insured's own work."); *Mid-Continent Cas. Co. v. Castagna*, 410 S.W.3d 445, 458 (Tex. App.—Dallas 2013, pet. denied) (court acknowledged policy endorsement CG2294 but did not address that argument and denied indemnity on other grounds); *VRV Dev. L.P. v. Mid-Continent Cas. Co*., 630 F.3d 451, 455, 457 (5th Cir. 2011) (CGL policies protect an insured when his work damages another's property, but they do not serve as "a performance bond covering an insured's own work"; no duty to defend/indemnify under CGL policy with CG2294 exclusion for damage to work performed by insured or its subcontractors; also, damage occurred after expiration of policy); *Universal Cas. Co. v. A.E. Consultants, LLC*, 2009 WL 10697417 at *8 (S.D. Tex. June 26, 2009) (no duty to defend/indemnify for property damage arising out of completed work due to exclusion (l)); *Townsen v. Mid-Continent Cas. Co*., 2008 WL 11429739 at *8 (N.D. Tex. Oct. 23, 2008) (exclusion (l), among others, bars coverage for allegations concerning defective work); *Vogelbusch USA, Inc. v. State Farm Lloyds*, 2004 WL 1554995 at *4 (Tex. App.—Houston [14th Dist.] July 13, 2004, no pet.) (exclusion (l) is unambiguous and precludes duty to defend); *Dal-Tile Corp. v. Zurich Am. Ins. Co*., 2004 WL 414900 at *5 (N.D. Tex. Feb. 2, 2004) (several policy exclusions, including exclusion (l) barred duty to defend/indemnify).

[their] intended use" by the new homeowners.  The completed homes were thus McMillan's

"products-completed operations."  Although the homes may have subsequently needed repair, the

definition of "products-completed operations" specifically states:  "Work that may need service,

maintenance, correction, repair or replacement, but which is otherwise complete, will be treated

as completed."  There is no coverage for the completed homes which needed repair.  Because a

CGL policy is not designed to insure against faulty workmanship, the allegations in the Underlying

Petitions are excluded from coverage.

6.23    "Your work" also includes representations as to quality, so the allegations regarding

misrepresentations would also fall under this exclusion.  The damages alleged arise out of

"property damage" to McMillin's completed work (including representations as to quality).  Thus,

the allegations regarding representations as to quality are excluded and the insurance does not

apply to the Insurance Claims.

6.24    Looking at the "eight corners" of the Underlying Petitions and the Policies, the allegations

arise out of the faulty workmanship of McMillin's subcontractors in constructing the "artificial

stucco" exterior finish on the Homes and are excluded by the "your work" exclusion found in the

CG2294 Endorsement to the Policies, among other exclusions discussed *infra*.  The CG2294

Endorsement excludes property damage to the insured's completed work arising out of it or any

part of it.  Thus, the Insurance Claims fall outside the scope of coverage of the Insurance Policies.

The duty to defend is triggered by a suit seeking damages covered by the insurance.  Here, **there

is no duty to defend McMillin because the allegations in the Underlying Petitions, taken as

true, are excluded by the CG2294 Endorsement.**

6.25    The duty to indemnify is separate from the duty to defend.  The duty to indemnify is

triggered when the insured becomes legally obligated to pay damages because of covered property

damage.  Here, the same reasons which negate the duty to defend also negate the duty to indemnify.

The CG2294 Endorsement bars coverage for the allegations of "property damage" to McMillin's

completed work (including representations as to quality), which means the insurance does not

apply to these allegations.  Even if McMillin became legally obligated to pay damages for the

Insurance Claims, no facts can be developed in the Underlying Lawsuits that can transform the

faulty workmanship claims into a covered occurrence.  Accordingly, **the CG2294 Endorsement**

**bars the duty to indemnify McMillin for the Insurance Claims**.


### 3. DAMAGE TO PROPERTY – EXCLUSION J

6.26    To attempt to defeat the purpose of a CGL policy and avoid the CG2294 Endorsement

above, McMillin may argue the alleged damages arose out of ongoing operations.  However, the

Policies state:

> **2.      Exclusions**
>
> This insurance does not apply to:
>
> **j.      Damage To Property**
>
> "Property damage" to:
>
> (1)    Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;
>
> …
>
> (5)    That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>
> (6)    That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
>
> …

> Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

6.27    First, the Underlying Lawsuits do not allege damage which occurred during McMillin's operations.  Even if they did, Exclusion "j(5)" excludes "property damage" to that particular part of real property on which the insured (or any subcontractors working on its behalf) are performing operations, if the "property damage" arises out of those operations.  Exclusion j(5) applies to damages to real property that occur while operations are being performed.[5]  The j(5) and j(6) exclusions apply only to "that particular part" on which the insured "performed" work.  *Gonzalez v. Mid-Continent Cas. Co.*, 19-10565, 2020 WL 4696766, at *5 (5th Cir. Aug. 13, 2020).  In other words, Exclusions j(5) and j(6) exclude damage to the specific unit of property on which the insured was actually working, or which must be restored, repaired, or replaced because the insured's actual work on it was incorrectly performed.

6.28    Here, the actual occurrence date is immaterial—these claims are not covered.  Exclusion "j(5)" precludes coverage if the damage to the Homes occurred while McMillin was building the Homes, and CG2294 precludes coverage if the property damage occurred after McMillin had completed the homes.  This is because a CGL policy does not cover:  (a) property over which the insured has management and control and for which the insured should obtain separate first-party property insurance [Exclusion "j(5)"]; and (b) property damage caused by the insured's faulty

---

[5] *See Mid-Continent Cas. Co. v. JHP Dev., Inc*., 557 F.3d 207 (5th Cir. 2009) ("The parties agree that the use of the present tense "are performing operations" in exclusion j(5) makes clear that the exclusion only applies to property damage that occurred during the performance of construction operations by JHP . . . ."); *Lamar Homes, Inc. v. Mid-Continent Cas. Co*., 242 S.W.3d 1, 11 (Tex. 2007) ("This exclusion applies while operations are being performed."); *Lennar Corp. v. Great Am. Ins. Co*., 200 S.W.3d 651, 686 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) ("Giving the exclusion its plain meaning, the use of the present tense indicates the exclusion applies only to 'property damage' arising while Lennar is currently working on a project."); *Luxury Living, Inc. v. Mid-Continent Cas. Co*., 2003 WL 22116202, at *17 (S.D. Tex. 2003) (noting that exclusion j(5) could not apply because the underlying plaintiff claimed damage to the home after its closing); *CU Lloyd's of Texas v. Main Street Homes*, 79 S.W.3d 687, 695 (Tex. App.—Austin 2002, no pet.) ("Since the underlying petitions indicate that Main Street had completed construction and sold the homes to the home buyers before the alleged damage resulted, the exclusion does not preclude Lloyd's duty to defend Main Street.").

workmanship or products which the insured, not the insurer, must warranty (CG2294).  Exclusion "j(5)" and the "your work" exclusion are among several "business risk" exclusions commonly included in CGL policies.  CGL policies do not protect the insured's own product which it placed into the stream of commerce, as liability insurers do not warrant their insureds' products.  CGL policies protect an insured when his work damages a third-party's property, but they do not serve as "a performance bond covering an insured's own work."  *VRV Dev. L.P. v. Mid-Continent Cas. Co*., 630 F.3d 451, 457 (5th Cir. 2011) quoting *Wilshire Ins. Co. v. RJT Const., LLC*, 581 F.3d 222, 226 (5th Cir. 2009).

6.29    Moreover, Exclusion "j(6)" excludes "property damage" to that particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.  This exclusion does not apply to "property damage" included in the "products-completed operations hazard" (completed work).  In other words, Exclusion j(6) eliminates coverage for damage *during* as well as *after* the portions of the work are finished, provided the work does not fall into the "products-completed operations hazard."

6.30    The rationale behind exclusion "j(6)" "is to protect the insurer from 'attempts to recover funds to correct deficiencies caused by the contractors' questionable performance.' "  *Admiral Ins. Co. v. Little Big Inch Pipeline Co., Inc.*, 523 F. Supp. 2d 524, 541 (W.D. Tex. 2007) citing *SW Tank and Treater Mfg. Co. v. Mid–Continent Cas. Co*., 243 F.Supp.2d 597, 603 (E.D. Tex. 2003) (citing *T.C. Bateson Constr. Co. v. Lumbermens Mut. Cas. Co*., 784 S.W.2d 692, 695 (Tex. App.—Houston 1989, writ denied)).  The exclusion "demonstrates the insurers' belief that the cost of not performing well is a cost of doing business and not considered part of the risk sharing scheme for which general liability policies are written."  *Id*. (citing *T.C. Bateson*, 784 S.W.2d at 695).

6.31    Again, the Underlying Lawsuits do not allege damage which occurred during McMillin's operations.  If they did, Exclusion "j(6)" bars the duty to defend McMillin for allegations regarding ongoing operations to the parts of the Homes that must be restored, repaired or replaced due to faulty work.  For the same reasons, Exclusion "j(6)" would also bar the duty to indemnify.

### 4.    DAMAGE TO IMPAIRED PROPERTY – EXCLUSION M

6.32    The Underlying Plaintiffs claim:

- Subsequent to construction of the Home, certain design and construction deficiencies were observed at the Home which include, but are not limited to, an inadequately and improperly installed stucco system.

- Damages were proximately caused by the improper design and/or construction of the Home, which has resulted in numerous defects and deficiencies in the various systems and components in the Home, including violations of local and state building codes.

- The Home has suffered damages to the exterior stucco, underlying wire lath, paper backing, water resistive barriers, sheathing, interior walls, interior floors and/or other property which reduce the value of the Home and/or require repairs to correct the defects.

- **Breach of Contract** – McMillin agreed to construct the Home in accordance with plans and specifications incorporated into the contract and violated the contract by constructing the home in a defective and poor workmanlike manner, by violating the Texas Building Code, and by deviating from the construction plans.

- **Negligence *Per Se*** – McMillin violated local building codes and the Texas Building Code, including the applicable ASTM Standards, by inadequately and improperly installing the stucco system on the Home.

- **Negligence** – McMillin breached its nondelegable duty to design, construct, sell and/or repair the Home in accordance with all plans, specifications, design professional recommendations, manufacturers installation instructions, building codes, industry standards, and government agency requirements ("Requirements").

- **Negligence** – McMillin breached its nondelegable duty to ensure the Home was designed and performed in a good and workmanlike manner and was suited for its reasonable anticipated use.

*See* **Exhibits C-E**, Underlying Lawsuits.

6.33    The Policies contain an exclusion as follows:

   **2.    Exclusions**

   This insurance does not apply to:

   **m.    Damage to Impaired Property or Property Not Physically Injured**

   "Property damage" to "impaired property" or property that has not been physically injured, arising out of:

   (1)    A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

   (2)    A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

   This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

   …

   8.    "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a.    It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b.    You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

6.34    Exclusion (m) is one of the "business risk" exclusions and excludes coverage when the cause of loss is within the insured's control, such as the quality and conformity of the product. The Policy sets forth a two-part definition of "impaired property." Exclusion (m) involves "property damage" to: (1) impaired property [which is property that cannot be used or is less useful because (a) it incorporates the insured's defective work or (b) the insured failed to fulfill the terms of a contract]; or (2) "loss of use" claims for property that has not been physically injured, arising out of defective work or failure to perform a contract if such property can be restored to use by repair or fulfilling the contract terms. Exclusion (m) does not apply to loss of use of other property

arising out of sudden and accidental physical injury to the insured's work after it has been put to its intended use.

6.35    Here, the Homes would be considered "impaired property" – they are "less useful" because they incorporate McMillin's defective work.   Additionally, the Homes are "impaired property" because McMillin failed to fulfill the terms of the agreement with the homeowner.   The "impaired property" is susceptible to full restoration by repairing, replacing, adjusting, or removing the insured's "work" or the insured's "product."   The degradation alleged would be entirely repaired by simply fixing the stucco. *See Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864, 876 (5th Cir. 2009).

6.36    Going back to the exclusion, the Homes have incurred "property damage" arising out of McMillin's defective work.   Additionally, the "property damage" arose out of McMillin's failure to perform the contract terms.

6.37    The exception to Exclusion (m) does not apply because there has been no "loss of use" claimed.   In addition, there was no "sudden and accidental" physical injury to McMillin's work after it was put to its intended use.   Rather, the Underlying Petitions allege the damage was the result of design and/or construction defects and not "sudden and accidental" like a lightning strike.

6.38    To the extent recovery is sought for damages for repairing or replacing property that is "impaired" because it incorporates McMillin's work, or because McMillin failed to fulfill the terms of a contract or agreement, then, as outlined above, such damages would fall under Exclusion (m).   Accordingly, **there is no duty to defend McMillin for these damages**.

6.39    The same reasons that negate the duty to defend also negate the duty to indemnify.   Due to the application of Exclusion (m), **the insurance does not apply to these damages, which negates the duty to indemnify**.

### C.    "EIFS" EXCLUSION

6.40    In the Underlying Lawsuits, the Underlying Plaintiffs claim:

- Subsequent to construction of the Home, certain design and construction deficiencies were observed at the Home which include, but are not limited to, an inadequately and improperly installed stucco system.

- Damages were proximately caused by the improper design and/or construction of the Home, which has resulted in numerous defects and deficiencies in the various systems and components in the Home, including violations of local and state building codes.

- The Home has suffered damages to the exterior stucco, underlying wire lath, paper backing, water resistive barriers, sheathing, interior walls, interior floors and/or other property which reduce the value of the Home and/or require repairs to correct the defects.

- **Breach of Contract** – McMillin agreed to construct the Home in accordance with plans and specifications incorporated into the contract and violated the contract by constructing the home in a defective and poor workmanlike manner, by violating the Texas Building Code, and by deviating from the construction plans.

- **Negligence *Per Se*** – McMillin violated local building codes and the Texas Building Code, including the applicable ASTM Standards, by inadequately and improperly installing the stucco system on the Home.

- **Negligence** – McMillin breached its nondelegable duty to design, construct, sell and/or repair the Home in accordance with all plans, specifications, design professional recommendations, manufacturers installation instructions, building codes, industry standards, and government agency requirements.

*See* **Exhibits C-E**, Underlying Petitions.

6.41    The RCLA Demands, while not "suits" which trigger coverage, offer additional insight into the nature of the Underlying Plaintiffs' claims.  The RCLA Demands concern the damages "on the exterior stucco finish of the residence[s]" and claim "the stucco observed at the residence was not installed in accordance with the code in effect at the time of the original construction" and "shall be removed and replaced."   The RCLA Demands allege "[p]otential issues related to improper house wrap installation, improper spacing between sheathing panels, improper window

flashing, insufficient paint thickness, or lack of proper sealants can allow increased moisture or volume changes in framing materials to detrimentally affect the stucco system." *See* **Exhibit A**, RCLA Demands.

6.42    The Policies exclude damage caused by EIFS and similar exterior finish systems via endorsement (CG 21 86):

### EXCLUSION – EXTERIOR INSULATION AND FINISH SYSTEMS

This endorsement modifies insurance provided under the following:

A.    This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

   1.    The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

   2.    "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

B.    The following definition is added to the Definitions Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

   1.    A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;

   2.    The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

   3.    A reinforced or unreinforced base coat;

   4.    A finish coat providing surface texture to which color may be added; and

   5.    Any flashing, caulking or sealant used with the system for any purpose.

6.43    The Policies exclude "property damage" caused by design, construction, or installation of any EIFS or any substantially similar system including its coatings or sealants.  The Policies further exclude "property damage" arising out of McMillin's work with respect to any exterior feature of any structure if EIFS or a substantially similar system is used on the part of the structure containing that feature.   It's significant that a Section A(1) of this exclusion applies to EIFS "or any substantially similar system or any part thereof."   That additional phrase implicates the exterior finish on the subject properties and the Insurance Claims arising out of them are excluded.

6.44    Long used in commercial construction, EIFS was marketed in the early 1990s as an attractive alternative to conventional stucco in home construction; but installed on wood-frame walls typical of single-family homes, EIFS traps water inside, causing rot and structural damage, mildew and mold, and termite infestations.  *Lennar Corp. v. Markel Am. Ins. Co.*, 413 S.W.3d 750, 751–52 (Tex. 2013).  Unlike traditional stucco, EIFS is applied in layers.  Here, McMillin used the Western 1-Kote Exterior Stucco System on the homes in question which is another type of layered exterior finish.  *See* **Exhibit F,** Parker Engineering Report.  As stated, there is no coverage for "property damage" caused by design, construction, or installation of any EIFS or substantially similar system.  There is also no coverage for "property damage" arising out of McMillin's work with respect to any exterior feature of any structure if EIFS or a substantially similar system is used on the part of the structure containing that feature.  All of the allegations made the basis of the Insurance Claims arise out of the faulty stucco exterior installed by McMillin.  Thus, **the EIFS exclusion bars the duty to defend McMillin for the Insurance Claims**.

6.45    Likewise, because the entirety of the Underlying Petitions are based on McMillin's faulty design and workmanship in installing the artificial stucco system, **the EIFS exclusion bars the duty to indemnify McMillin for the Insurance Claims**.

42

### D.      FUNGI OR BACTERIA EXCLUSION

6.46    In the Underlying Lawsuits, the Underlying Plaintiffs claim:

- Damages were proximately caused by the improper design and/or construction of the Home, which has resulted in numerous defects and deficiencies in the various systems and components in the Home, including violations of local and state building codes.

- The Home has suffered damages to the exterior stucco, underlying wire lath, paper backing, water resistive barriers, sheathing, interior walls, interior floors and/or other property which reduce the value of the Home and/or require repairs to correct the defects.

*See* **Exhibits C-E**, Underlying Petitions.

6.47    The RCLA Demands, while not "suits" which trigger coverage, offer additional insight into the nature of the Underlying Plaintiffs' claims.  The RCLA Demands concern the damages "on the exterior stucco finish of the residence[s]" and claim "the stucco observed at the residence was not installed in accordance with the code in effect at the time of the original construction" and "shall be removed and replaced."   The RCLA Demands allege "[p]otential issues related to improper house wrap installation, improper spacing between sheathing panels, improper window flashing, insufficient paint thickness, or lack of proper sealants can allow increased moisture or volume changes in framing materials to detrimentally affect the stucco system."   *See* **Exhibit A**, RCLA Demands.

6.48    The policies contain an endorsement adding an expanded "Fungi or Bacteria Exclusion" (CG 21 67 12 04) which impacts any potential mold claims:

> **2.     Exclusions**
>
> This insurance does not apply to:
>
> **Fungi Or Bacteria**
>
> a.      "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or

structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

b.      Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

…

C.      The following definition is added to the Definitions Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

6.49    Under these provisions, any mold damage claims are excluded.   Thus, to the extent the Claimants allege "property damage" which would not have occurred but for the existence of mold or other fungi or bacteria, and any associated testing or remediation expenses, **there is no duty to defend McMillin for such damages due to the "fungi or bacteria" exclusion**.

6.50    Accordingly, **the "fungi or bacteria" exclusion also negates the duty to indemnify McMillin** to the extent the Underlying Plaintiffs assert claims or damages for the presence of mold, mold testing or remediation expenses.

### E.      CONSTRUCTION MANAGEMENT EXCLUSION

6.51    In the Underlying Lawsuits, the Underlying Plaintiffs claim:

- Subsequent to construction of the Home, certain design and construction deficiencies were observed at the Home which include, but are not limited to, an inadequately and improperly installed stucco system.

- Damages were proximately caused by the improper design and/or construction of the Home, which has resulted in numerous defects and deficiencies in the various systems and components in the Home, including violations of local and state building codes.

- The Home has suffered damages to the exterior stucco, underlying wire lath, paper backing, water resistive barriers, sheathing, interior walls, interior floors and/or other property which reduce the value of the Home and/or require repairs to correct the defects.

- **Breach of Contract** – McMillin agreed to construct the Home in accordance with plans and specifications incorporated into the contract and violated the contract by constructing the home in a defective and poor workmanlike manner, by violating the Texas Building Code, and by deviating from the construction plans.

- **Negligence *Per Se*** – McMillin violated local building codes and the Texas Building Code, including the applicable ASTM Standards, by inadequately and improperly installing the stucco system on the Home.

- **Negligence** – McMillin breached its nondelegable duty to design, construct, sell and/or repair the Home in accordance with all plans, specifications, design professional recommendations, manufacturers installation instructions, building codes, industry standards, and government agency requirements ("Requirements").

- **Negligence** – McMillin breached its nondelegable duty to ensure the Home was designed and performed in a good and workmanlike manner and was suited for its reasonable anticipated use.

*See* **Exhibits C-E**, Underlying Petitions.

6.52    The Policies contain an exclusion endorsement for "Construction Management Errors and

Omissions" (Endorsement 22 34 07 98) which provides:

> This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:
>
> 1.    The preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications by any architect, engineer or surveyor performing services on a project on which you serve as construction manager; or
>
> 2.    Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager.
>
> This exclusion does not apply to "bodily injury" or "property damage" due to construction or demolition work done by you, your "employees" or your subcontractors.

6.53    This endorsement excludes claims involving construction management errors or omissions. Here, McMillin was acting as "construction manager" given its wholescale use of subcontractors to build the Homes.    Accordingly, **this exclusion bars the duty to defend McMillin for "property damage" arising out of inspection, supervision, or quality control done by McMillin on a project for which it serves as construction manager**.

6.54    Likewise, the claims in the Underlying Petitions which involve inspection, supervision, or quality control on a project on which McMillin served as construction manager would be barred by the "Construction Management Errors and Omissions" Endorsement.    Because the insurance would not apply to those claims, **the duty to indemnify McMillin would also be precluded for those claims on a project for which McMillin serves as construction manager**.

## F.    PRODUCTS-COMPLETED OPERATIONS HAZARD

6.55    McMillin's policies that were effective from April 26, 2015 to April 26, 2018 contain the endorsement, Products – Completed Operations Exclusion (Form CG 21 04 11 85) which reads:

> This insurance does not apply to "bodily injury" or "property damage" included within the "products-completed operations hazard."

("P/CO" Exclusion).    *See* **Exhibit M**, 4/26/2015-16 Policy; **Exhibit N,** 4/26/2016-17 Policy; **Exhibit O,** 4/26/2017-18 Policy.    Thus, McMillin's 2015 to 2018 policies do not provide completed-operations coverage.    This is a broad exclusion in that it bars all "property damage" arising out of the insured's completed work, not just "property damage" to McMillin's completed work arising out of it.

6.56    Construction of the Homes involved in the Insurance Claims was completed prior to April 26, 2015 when this exclusion took effect.    However, any "property damage" to the Homes occurring after the Homes were completed and between April 26, 2015 and April 26, 2018, is thus

barred by this exclusion.  As such, **there is no duty to defend McMillin for any such claims or suits**.

6.57    Accordingly, as the Policies do not cover any "property damage" to the Homes which occurred after the Homes were completed and between April 26, 2015 and April 26, 2018, **the duty to indemnify McMillin for such damages would also be barred by the P/CO Exclusion**.

## I.    PRAYER

WHEREFORE, PREMISES CONSIDERED, Amerisure Mutual Insurance Company prays that the Court will, upon a final hearing, enter a declaratory judgment regarding the rights and obligations between Amerisure and Defendant, namely:

1.    There is no coverage for the RCLA Demands under the Policies due to the relevant policy conditions, exclusions, or endorsements;

2.    There is no coverage for the Arbitration under the Policies due to the relevant policy conditions, exclusions, or endorsements;

3.    There is no coverage for the Underlying Lawsuits under the Policies due to the relevant policy conditions, exclusions, or endorsements;

4.    There is no duty to defend McMillin for the claims asserted in the RCLA Demands under the Policies;

5.    There is no duty to defend McMillin for the claims asserted in the Arbitration under the Policies;

6.    There is no duty to defend McMillin for the claims asserted in the Underlying Lawsuits under the Policies;

7.    There is no duty to indemnify McMillin for the claims asserted in the RCLA Demands under the Policies;

8.   There is no duty to indemnify McMillin for the claims asserted in the Arbitration under the Policies;

9.   There is no duty to indemnify McMillin for the claims asserted in the Underlying Lawsuit under the Policies; and

10.   McMillin, its subcontractors, and the Claimants involved in the Insurance Claims are not entitled to any claim benefits or payments under the Policies, including but not limited to monetary payments, attorney's fees, costs and/or expenses of any kind.

Respectfully submitted,

*/s/ Christopher W. Martin*

Christopher W. Martin
Texas Bar No. 13057620
Federal I.D. No. 13515
martin@mdjwlaw.com
808 Travis, Suite 1100
Houston, Texas  77002
Telephone:  (713) 632-1700
Facsimile:  (713) 222-0101
**ATTORNEY-IN-CHARGE FOR PLAINTIFF**

OF COUNSEL:

**MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.**
808 Travis Street, Suite 1100
Houston, Texas 77002
Telephone:     (713) 632-1700
Facsimile:      (713) 222-0101

**Amber R. Dunten**
Texas Bar No. 24010004
Federal I.D. 31660
dunten@mdjwlaw.com